James H. Hohenstein
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: jim.hohenstein@hklaw.com
        marie.larsen@hklaw.com

*Attorneys for Plaintiffs,*
*Western Bulk Carriers AS and*
*Western Bulk Chartering AS*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WESTERN BULK CARRIERS AS and WESTERN BULK CHARTERING AS individually and on behalf of M/V LONG LUCKY (IMO No. 9471654) | **15 CV 8304** <br><br> Case No. 15 Civ _____ ( ) |
| Plaintiffs, | |
| - against - | **COMPLAINT FOR INTERPLEADER** |
| O.W. BUNKER & TRADING A/S, O.W. SUPPLY & TRADING A/S, U.S. OIL TRADING, LLC and ING BANK N.V. | |
| Defendants. | |

Plaintiffs Western Bulk Carriers AS ("WB Carriers") and Western Bulk Chartering AS, ("WB Chartering") (collectively, "Western Bulk" or "Plaintiffs"), by and through their attorneys Holland & Knight LLP, bring this action pursuant to Rule 9(h), as and for their Complaint for Interpleader pursuant to 28 U.S.C. §§ 1335(a) and 2361 and allege, upon information and belief, as follows:

## THE PARTIES

1.      WB Carriers is a foreign corporation or business entity organized and existing pursuant to the laws of Norway, with an office and place of business at Henrik Ibsensgate 100, P.O. Box 2868, Soli, N-0230 Oslo, Norway.

2.      WB Chartering is a foreign corporation or business entity organized and existing pursuant to the laws of Norway, with an office and place of business at Henrik Ibsensgate 100, P.O. Box 2868, Soli, N-0230 Oslo, Norway.

3.      Defendant O.W. Bunker & Trading A/S ("O.W. Bunker") is a corporation or business entity organized and existing pursuant to the laws of Denmark, with an office and place of business at Stigsborgvej 60, DK-9400 Norresundby, Denmark.

4.      Defendant O.W. Supply & Trading A/S ("O.W. Supply" and together with O.W. Bunker, "O.W. Denmark") is a corporation or business entity organized and existing pursuant to the laws of Denmark, with an office and place of business at Stigsborgvej 60, DK-9400 Norresundby, Denmark.

5.      Defendant U.S. Oil Trading LLC ("USOT") is a corporation or business entity organized and existing pursuant to the laws of Delaware, is registered with the Washington Secretary of State and is authorized to do business within Washington State, and maintains its principle place of business at 3001 Marshall Avenue, Tacoma, Washington 98421.

6.      Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed.

R. Civ. P. 9(h),  inasmuch as it involves the interpleader of funds in the possession of Western

Bulk for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e.,

fuel oil or bunkers) to the vessel M/V Long Lucky (the "Vessel").

8.       This Court has original jurisdiction over this interpleader action pursuant to 28

U.S.C. § 1335(a) in that for the bunker payment in question: (a) at least two of the claimants are

of diverse citizenship; (b) the disputes between the claimants each involve funds in an amount

exceeding $500.00, exclusive of interest and costs; and (c) Plaintiffs, on behalf of the Vessel are

the stakeholders of the funds and, concurrently with the filing of this Complaint, will seek to

make a deposit in the Court's Registry in the principal sum of at least $115,766.23, which is the

amount due for the fuel delivery to the Vessel on November 1, 2014.  Additionally, Western

Bulk will seek to deposit an interest component to the principal sum in the amount of $6,945.97

for a total deposit of $122,712.20.

9.       This Court has personal jurisdiction over defendants O.W. Denmark pursuant to

the terms of the applicable bunker supply contract and O.W. Group Standard Terms and

Conditions.

10.      This Court also has personal jurisdiction over defendant USOT pursuant to 28

U.S.C. § 2361.

11.      This Court has personal jurisdiction over ING to the extent it is or may be a third-

party beneficiary of the bunker supply contracts at issue in this dispute and to the extent that it is

an alleged assignee of the receivables of O.W. Denmark.  Additionally, ING transacts business

within the jurisdiction of this Court and has a place of business at 1325 Avenue of the Americas, New York, New York 10019.

12.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

## NATURE OF ACTION

13.     This is an action for interpleader with respect to the principal sum of $115,766.23, representing the amount due for the supply of bunkers to the Vessel. With respect to payment for such supply, O.W. Denmark, USOT, ING or some other third party have and may have conflicting claims as to ownership of the fuel payment funds owed by Western Bulk for the purchase of and receipt of a specific and finite quantity of bunkers (fuel) in the Port of Tacoma, Washington by the Vessel (the "Fuel Delivery").

## FACTUAL BACKGROUND

14.     WB Carriers is the charterer of the M/V Long Lucky.

15.     On or about October 24, 2014, WB Carriers ordered bunkers to be loaded onboard and consumed by the vessel Long Lucky from O.W. Bunker. The bunkers were to be supplied to the Long Lucky within the Port of Tacoma, Washington between October 29, 2014 and November 2, 2014. A true and correct copy of the Sales Order Confirmation received from O.W. Bunker is attached hereto as Exhibit 1. On this document, the "supplier" is identified as "U.S. Oil".

16.     The bunkers were delivered to the Vessel on November 1, 2014. A bunker delivery receipt was issued by USOT. A true and correct copy of the bunker delivery receipt is attached hereto as Exhibit 2.

17.     An invoice was issued to WB Carriers on October 8, 2014 by O.W. Bunker for the supply of bunkers to Long Lucky. The invoice directs payment of $115,766.23 to O.W.

Bunker, to an ING account.  A true and correct copy of the bunker invoice is attached hereto as Exhibit 3.

18.     The bunkers delivered to the Vessel on November 1, 2014, were supplied by O.W. Bunker pursuant to the terns of a Master Agreement, dated July 15, 2014 between O.W. Supply and WB Chartering.  Pursuant to clause 1.1 of the Master Agreement, the contact was governed by O.W. Denmark's standard terms and conditions, which, pursuant to Clause 9.8 of the Master Agreement, includes any disputes related to the supply of bunkers by O.W. Bunker. A true and correct copy of the Master Agreement is attached hereto as Exhibit 4.

19.     The standard terms and conditions of all O.W. entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."  A true and correct copy of the O.W. terms is attached hereto as Exhibit 5.

20.     On November 7, 2014, O.W. Denmark and certain of their Danish subsidiaries and affiliates filed for bankruptcy in their home jurisdiction of Denmark.  Thereafter many other O.W. entities and/or affiliates filed for bankruptcy in various other jurisdictions around the world.  No foreign O.W. bankruptcy proceeding has been recognized in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

21.     Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries, and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.  On

November 13, 2014 PricewaterhouseCoopers LLP were appointed as joint receivers of assets assigned to ING.

22.     Due to the bankruptcy filings of O.W. Denmark and other O.W. group entities, O.W. Denmark, USOT and ING have sought or are expected to seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessel.

23.     On November 10, 2014, in response to the bankruptcy of O.W. Denmark, USOT requested payment of its invoice for the fuel delivery in the amount of $107,357.85 directly from Western Bulk.  A true and correct copy of the demand for payment is attached hereto as Exhibit 6.

24.     On June 19, 2015, ING, through its receivers and as assignee of O.W. Denmark, demanded payment of the outstanding bunker delivery invoice, or in the alternative, "to avoid the disruption that an arrest of your vessel(s) may cause" the posting of a Letter of Undertaking solely in favor of ING.  A true and correct copy of the demand for payment or security is attached hereto as Exhibit 7.

25.     On July 22, 2015, ING followed up on thirteen Western Bulk vessels which received O.W. Bunker fuel deliveries, demanding that payment of the disputed claims totaling over $4.6 million be paid within two days, and indicating that failure to pay would result in the pursuit of "legal actions to recover the balances, **including vessel arrests**" (emphasis in the original).  A true and correct copy of the demand for payment is attached hereto as Exhibit 8. Additional demands and threats of arrest have been made by ING, as recently as September 2015.

## POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER

26.     Under United States maritime law, the contract supplier (such as O.W. Bunker) of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel. Additionally, under certain circumstances, a physical supplier (or transporter) of the fuel (such as USOT) may also assert a maritime lien on that vessel.[1]

27.     Moreover, other parties, such as ING, have asserted a right to payment for the Fuel Delivery (*see* Exhibit 7).[2]   Upon information and belief ING's claims are based on assignments of receivables by various O.W. entities including but not limited to O.W. Bunker and O.W. Supply.

28.      The Vessel is currently trading in the spot market, including calls in the United States (as evidenced by the location of the fuel delivery at Tacoma, Washington), and it is anticipated that it will soon call at one or more ports in the United States and may face arrest (*see* Exhibits 6, 7 and 8) pursuant to Supplemental Admiralty Rule C by the defendants claiming to assert a maritime lien,[3] which would cause harm to Plaintiff, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit and interfere with maritime commerce.

---

[1] Western Bulk notes that USOT has been active in the arrest of vessels in various jurisdictions. *See U S Oil Trading LLC v M/V Vienna Express, et al*, Case No 14-cv-5982 (W D Wash), transferred to the Southern District of New York as Case No 15-cv-6718, *U S Oil Trading LLC v M/V Santa Roberta, M/V Seaspan Hamburg*, Case No 14-cv-9662 (C D Cal). Additionally, USOT is the appellant in the Second Circuit Court of Appeals. *Hapag-Lloyd Aktiengesellschaft v U S Oil Trading LLC*, Case No 15-097, wherein USOT seeks to appeal this Court's restraint on the arrest of vessels who have properly filed interpleader actions.

[2] A review of the Federal pacer electronic records system shows that ING is engaged in an aggressive national strategy of vessel arrests in connection with the O W Bunker disputes. *See e g, ING Bank N V v M/V White Diamond*, Case No 15-cv-24 (S D Tex) (summary judgment motion filed by ING), *ING Bank N V v M/V Temara*, Case No 15-cv-1488 (D Md) (summary judgment motion filed by ING), *Barcliff, LLC v M/V Deep Blue*, Case No 14-cv-590 (S D Ala) (ING as intervening arresting plaintiff, case scheduled for trial in November 2015)

[3] Plaintiffs make no assertion nor take a position as to the validity of any of the potentially asserted maritime lien or other claims by any of the Defendants or whether O W Denmark has validly assigned any maritime lien or other claims to ING. These issues remain to be decided.

29.     Western Bulk presently has control over the funds invoiced for the Fuel Delivery to the Vessel.  Plaintiffs disclaim any interest in the amount invoiced for the supply of bunkers to the Vessel.

30.     Western Bulk cannot ascertain whether the amount owed for the Fuel Delivery should be paid to O.W. Denmark, USOT or ING in order to extinguish all maritime liens and/or other claims against Western Bulk and the Vessel and to prevent the Vessel's arrest or attachment in this District or elsewhere and to prevent double liability for the Fuel Delivery.

31.     The competing claims of the Defendants or other third parties will likely expose Western Bulk and the Vessel to multiple liabilities in connection with the payment of the bunker invoice in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims.

32.     Western Bulk, acting on behalf of the Vessel, is entitled to deposit with the Court the sum of at least $115,776.23, representing the amount due pursuant to the invoices issued by O.W. Bunker for the Fuel Delivery, and require that O.W. Denmark, USOT, ING and any other claimant interplead among themselves to establish their respective rights to the funds.

33.     Further, in order to comply with the requirements of Supplemental Admiralty Rule E(5)(a) and for the funds deposited into the registry to constitute security for the *in rem* claims of the claimants and to act as the substitute *res* against which claimants must assert their maritime liens for the Fuel Delivery, Plaintiffs are prepared to deposit an additional amount ($6,945.97) constituting 6% interest per annum or such other amount as the court deems just and proper.  Thus, the total amount of the proposed deposit is calculated to be $122,712.20, inclusive of one year of interest.

34.    After depositing the sum of $122,712.20 with the Court, Western Bulk is entitled to be discharged from further *in personam* liability with respect to the funds and liability for payment for the Fuel Delivery.  The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the Fuel Delivery as described herein and as reflected in Exhibits 1-3.

WHEREFORE, Plaintiff Western Bulk Carriers AS and Western Bulk Chartering AS, individually and on behalf of the vessel Long Lucky, respectfully requests that this Court:

(i)    determine which of the defendants is entitled to the Fuel Delivery funds, or, in the alternative, the share of each defendant, if any;

(ii)    enjoin O.W. Bunker & Trading A/S, O.W. Supply &  Trading A/S, U.S. Oil Trading LLC, ING Bank, N.V. and any later-identified claimants from commencing any action against Western Bulk Carriers AS, Western Bulk Chartering AS or the vessel Long Lucky *in rem*, including but not limited to the arrest or attachment of the Vessel in any port, pursuant to Supplemental Admiralty Rules C or B based on the assertion of any *in rem* claim or *in personam* claim directed against Western Bulk for the provision of the bunkers referred to herein as the Fuel Delivery;

(iii)    discharge Western Bulk Carriers AS and Western Bulk Chartering AS from any liability on any claim that has been made or may in the future for the Fuel Delivery upon Plaintiffs' deposit of $122,712.20 into this Court's registry, or such other amount the Court finds sufficient to discharge Western Bulk and the Vessel from liability for the Fuel Delivery;

(iv)    discharge the Vessel from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Plaintiffs' deposit of $122,712.20 into this Court's registry;

(vi)     award Plaintiffs their costs and attorneys' fees in this action; and

(vii)    award the return of any amount remaining in the registry (e.g., the interest deposit) to the Plaintiffs upon the ultimate disposition of claims to the deposited Fuel Delivery funds; and

(viii)   award Plaintiffs such other and further relief which this Court may deem just and proper.

Dated:  New York, New York
        October 21, 2015

                                        HOLLAND & KNIGHT LLP

                                        By:  _____
                                        James H. Hohenstein
                                        Marie E. Larsen
                                        31 West 52nd Street
                                        New York, New York 10019
                                        Telephone:  212-513-3200
                                        Telefax: 212-385-9010
                                        Email:  jim.hohenstein@hklaw.com
                                                marie.larsen@hklaw.com

                                        *Attorneys for Plaintiffs, Western Bulk Carriers AS
                                        and Western Bulk Chartering AS, individually and
                                        on behalf of M/V LONG LUCKY (IMO No.
                                        9471654)*

#37550011_v2

10

<u>**EXHIBIT 1**</u>

# O.W. BUNKER & TRADING A/S
## Denmark RS Aalborg, South

**W Bunker**

Western Bulk Carriers AS
Henrik Ibsens Gate 100
P O Box 2868 Soli
N 0230 Oslo
Norway
Mrs Helle Græsdal

Stigsborgvej 60
DK-9400 Nørresundby
Denmark
Phone  + 45 98 12 72 77
Fax     + 45 98 16 72 77
Telex  69851 OWOIL DK
Cables  BUNKER AALBORG DENMARK
E-mail  owbunker@owbunker dk
Internet  http www.owbunker com
CVR  DK66441717
EU VAT No  DK66441717
ING Bank N V
IBAN  NL39 INGB 0020 0835 56
IBAN  NL16 INGB 0650 1751 15
SWIFT  INGBNL2A
IBAN  NL39 INGB 0020 0835 56
SWIFT  INGBNL2A

## Sales Order Confirmation

| | |
|---|---|
| Sales Order No | 188-14726 |

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| Vessel | LONG LUCKY (IMO  9471654) |
| Port | TACOMA |
| Delivery date | Between 29  October 2014 and 2  November 2014 |
| Seller | O  W   BUNKER & TRADING A/S |
| Your ref | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV LONG LUCKY AND/OR WESTERN BULK CARRIERS AS |

24  October 2014

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 150 00 200 00 | MT | Fueloil 380 CST | USD | 517 00 | MT | US Oil Delivery  Barge |
| 1 00 | LPS | Barging | USD | 8 000 00 | LPS | US Oil Delivery  Barge |
| 1 00 | LPS | Booming fee | USD | 2 200 00 | LPS | US Oil Delivery  Barge |

| | |
|---|---|
| Agent | WILHELMSEN |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2005 (E) RMG 380 |

We thank you for this nomination

Kind Regards

Michael Lefevre

| | |
|---|---|
| Direct | +45 99 31 83 05 |
| Mobile | +45 23 42 46 65 |
| Yahoo ID | mian_owbunker |
| E-Mail | mian@owbunker dk |
| Office E Mail | wwt@owbunker dk |

# O.W. BUNKER & TRADING A/S
# Denmark RS Aalborg, South



TERMS AND CONDITIONS
---------- ---- ------- - ----------

SAMPLES

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties

TERMS

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers  The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as  Buyer  and to O  W   BUNKER & TRADING A/S as  Seller
The fixed terms and conditions are well known to you and remain in your possession  If this is not the case, the terms can be found under the web address
http //owbunker com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013 pdf

GUIDELINES FOR RECEIVING BUNKERS

We strongly urge you to forward the information regarding  General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard Following the suggested Guidelines should minimize risk of quantity disputes Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important

OTHERWISE

Any errors or omissions in above Confirmation should be reported immediately


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING

# O.W. BUNKER & TRADING A/S
# Denmark RS Aalborg, South

 **Bunker**

GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified

Make sure to witness and verify initial measurements and ullaging onboard the barge before ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks) Compare measurements and verify the quantities as per barge ullage tables When in full agreement please sign the ullage/sounding report for Before Supply figures If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt)

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures

DURING BUNKERING

Always place a watchman to witness safe operation including also proper and correct sampling The watchman must ensure that sampling is done properly as continuous drip sampling throughout the delivery, and that clean devices are used for sampling Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles including proper labeling and sealing of ALL samples Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes All seal numbers to be inserted into the Bunker Delivery Receipt (BDR) The MARPOL sample must be one of these samples drawn under witnessing

The watchman must pay special attention to the bunker hose and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks which stripping to be agreed in advance by both parties If air is blown on continued basis and stoppage on the supply not possible for any reason the incident to be stated on a Letter of Protest which should also contain the time (hours from/to) that airblow was notified

It is known in some areas that the so called Cappucino Effect may be used or attempted to be used during supply Pay special attention hereto and take all necessary precautions to observe which includes
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging
  Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge
  Agree with the barge when and if they are going to make stripping of their tanks
  Check and note the draft fore mid and aft on the barge before and after supply to compare
  If any signs at all of cappuccino or similar (except eventual stripping agreed in advance) please stop the supply immediately and compare supply quantities made so far
  Contact vessel operator in charge and request notification to the Seller and Supplier immediately
  If surveyor attending please ensure that the surveyor signs a Letter of Protest also
  After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re measure the barge jointly with barge Master

AFTER COMPLETION

Repeat the measurement sounding and ullaging of the barge, including verification of temperature of each tank Make sure also on completion to verify contents of ALL tanks, including those being idle

Report (ullage) must be signed by all parties involved including eventual nominated surveyor If disagreements with the figures (mm temperature) a Letter of Protest to be issued but also such specific disagreements to be stated on the Ullage report covering ' after ' supply

QUANTITY COMPLAINTS

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers

## EXHIBIT 2

## U S OIL TRADING, LLC

MARINE BUNKER
RECEIPT FOR DELIVERY TO VESSEL

| TACOMA REFINERY P.O. BOX 2269 ACCLA WA 9840 -2269 (253) 383-164 | VESSEL NAME LONG LUCKY | IMO 9471954 | VESSEL AGENT WILHELMSEN |
|---|---|---|---|
| | BARGE COMPANY OLYMPIC TUG & BARGE | BARGE NO BETSY ARNTZ | U S OIL S A NUMBER 14 192 |

DELIVERY LOCATION INCLUDE TERMINAL OR DOCK NAME: **AT ANCHOR**

### PRODUCT

| CRADE | DENSITY | VISCOSITY | POUR POINT DEGREES C | SULPHUR % | VISCOSITY CST @ 50 C | FLASH PT | VANADIUM PPM |
|---|---|---|---|---|---|---|---|
| RMG 380 | 978 | 1 0 | 105° | -9 | 2.662% | <0.05 | 371 30 | | |

### QUANTITY

| | CRADE RMG 380 | GRAD | MGO | GRADE |
|---|---|---|---|---|
| Total Gross Barrels Delivered To Barge | 1358.62 | 0.00 | 0.01 |
| Temp and Corr Correction Factor | 0.9974 | | |
| Total In Barrels | 1314.33 | 0.00 | 0.00 |
| Conversion Factor Barrels To | 0.15336 | | |
| Metric Tons Delivered | 201.19 | 0.00 | 0.01 |

| November 2014 | 10 22 | November 1, 2014 | 11 20 | November 1 2011 | 12 20 |

REMARKS

BARGE: BETSY ARNTZ

VESSEL OR TERMINAL NAME   LONG LUCKY        TACOMA   US OIL S A NUMBER   14-192

VOYAGE #   36462

IMO# 9471654

### ARRIVAL CONDITION

| Tank | Product Name | A.P.I. | Ullage (Ft) | (in) | Temp. (°F) | Water (Bbls) | Gross Bbls | Net Bbls | Metric Tons |
|------|------|------|------|------|------|------|------|------|------|
| 1P | RMG 380 | 13.0 | 22 | 9.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1S | RMG 380 | 13.0 | 22 | 3.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2C | RMG 380 | 13.0 | 22 | 7.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3P | MGO | 35.1 | 22 | 11.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3S | MGO | 35.1 | 20 | 6.33 | 60.0 | 0.00 | 299.73 | 299.78 | 40.39 |
| 4P | RMG 380 | 13.0 | 15 | 6.13 | 144.0 | 0.00 | 1358.62 | 1314.33 | 204.19 |
| 4S | RMG 380 | 13.0 | 22 | 1.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5P | RMG 380 | 13.0 | 22 | 9.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6S | RMG 380 | 13.0 | 22 | 8.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |

|  | DATE | TIME |
|------|------|------|
| ALL FAST | 1-Nov-14 | 10:22 |
| HOSE ON 1 | 1-Nov-14 | 11:00 |
| COM L/D 1 | 1-Nov-14 | 11:20 |
| COMP L/D 1 | 1-Nov-14 | 12:20 |
| HOSE OFF 1 | 1-Nov-14 | 12:40 |
| HOSE ON 2 | N/A | N/A |
| COM L/D 2 | N/A | N/A |
| COMP L/D 2 | N/A | N/A |
| HOSE OFF 2 | N/A | N/A |
| BOOM ON | 01-Nov-14 | 11:10 |
| BOOM OFF | 01-Nov-14 | 12:55 |
| DEPART | 01-Nov-14 | 13:15 |

### Summary of Arrival Condition

| | | | | Water | Gross | Net | Metric |
|------|------|------|------|------|------|------|------|
| RMG 380 | 13.0 | | | 0.00 | 1358.62 | 1314.33 | 204.19 |
| MGO | 35.1 | | | 0.00 | 299.78 | 299.78 | 40.39 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |

ARRIVAL DRAFTS

|  | Port | Stbd. |
|------|------|------|
| Fwd: | 5'0" | 5'0" |
| Aft: | 5'6" | 5'6" |

### DEPARTURE CONDITION

| Tank | Product Name | A.P.I. | Ullage (Ft) | (in) | Temp. (°F) | Water (Bbls) | Gross Bbls | Net Bbls | Metric Tons |
|------|------|------|------|------|------|------|------|------|------|
| 1P | RMG 380 | 13.0 | 22 | 9.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1S | RMG 380 | 13.0 | 22 | 3.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2C | RMG 380 | 13.0 | 22 | 7.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3P | MGO | 35.1 | 22 | 4.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3S | MGO | 35.1 | 20 | 6.33 | 60.0 | 0.00 | 299.73 | 299.78 | 40.39 |
| 4P | RMG 380 | 13.0 | 22 | 1.00 | 124.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4S | RMG 380 | 13.0 | 22 | 1.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5P | RMG 380 | 13.0 | 22 | 9.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6S | RMG 380 | 13.0 | 22 | 8.00 | 60.0 | 0.00 | 0.00 | 0.00 | 0.00 |

Water Sp. Gravity = 1.025
Fresh Water = 1.000
Salt Water = 1.025

### Summary of Departure Condition

| | | | | Water | Gross | Net | Metric |
|------|------|------|------|------|------|------|------|
| RMG 380 | 13.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| MGO | 35.1 | | | 0.00 | 299.78 | 299.78 | 40.39 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |

Departure Drafts

|  | Port | Stbd. |
|------|------|------|
| Fwd: | 4'0" | 4'0" |
| Aft: | 4'3" | 4'3" |

### Products Loaded (+) / Discharged (-)

| | | | | Water | Gross | Net | Metric |
|------|------|------|------|------|------|------|------|
| RMG 380 | 13.0 | | | 0.00 | -1358.62 | -1314.33 | -204.19 |
| MGO | 35.1 | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 |

Tankerman: _B. Webb_                Terminal / Vessel Rep.: _DAX a Tunny_

**EXHIBIT 3**



M/V LONG LUCKY IMO 9471654
AND/OR OWNERS/CHARTERERS

Western Bulk Carriers AS
Henrik Ibsens Gate 100
P O Box 2868, Soli
N-0230 Oslo
Norway

| | |
|---|---|
| DATE OF INVOICE | : 01. November 2014 |
| INVOICE NO | : 188-14966 |
| ORDER NO. | : 188-14726 |
| ACCOUNT NO | : 28577 |
| OUR REF | : Michael Lefevre Andersen |
| DATE OF SUPPLY | : 01. November 2014 |
| DUE DATE | : 01 December 2014 |

PORT TACOMA
YOUR REFRENCE

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 1,000 1 PS | Barging | 8 000,00 1 PS | 8 000,00 |
| 1 000 LPS | Booming fee | 2 200,00 LPS | 2,200,00 |
| 204 190 MT | Fueloil 380 CST | 517,00 MT | 105 566 23 |

| | | | | |
|---|---|---|---|---|
| | | Net Amount | USD | 115 766,23 |
| Your VAT No | | VAT Amount | USD | 0 00 |
| Our VAT No   DK66 44 17 17 | | Total | USD | 115 766,23 |

| Taxable Amount DK | 0% VAT Amount DKK | Amount incl VAT DKK | Rate of exchange DKK |
|---|---|---|---|
| 688 126 24 | 0,00 | 688 126 24 | 5,944102 |

The prices are excl all taxes and/or other fees

TERMS OF PAYMENT   30 days from date of delivery With value date not later than DUE DATE or previous working day when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

By issuing this invoice the estate has not assumed or decided to assume any ongoing agreement which may
have entered into prior to the bankruptcy
Payment in full can only be made to the accounts as follow

| | |
|---|---|
| BANK: | Nordea Bank Danmark A/S |

O W BUNKER & TRADING A/S IN BANKRUPTCY
Stigsborgvej 60

| | | |
|---|---|---|
| ACCOUNT | For payment in DKK to account | 2191 4387872588 |
| | For payment in USD to account | IBAN, DK 9820005036491991 |
| | For payment in EUR to account | IBAN DK 9720005036492009 |
| | SWIFT NDEADKKK | |

DK 9400 Nørresundby

Phone  + 45 98 12 72 77
Fax    + 45 98 16 72 77
E mail owbunker@owbunker dk
Internet http www owbunker com

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account

CVR DK66441717
EU VAT No DK66441717

# EXHIBIT 4

MASTER AGREEMENT
FIXED PRICE TRANSACTIONS

Dated as of July 15th 2014

Between

| | | |
|---|---|---|
| O W Supply & Trading A/S | and | Western Bulk Chartering AS |
| CVR No 17729071 | | Reg No 892873232 |
| Stigsborgvej 60 | | Henrik Ibsensgate 100 |
| 9400, Noerresundby | | P O Box 2868 Solli |
| Denmark | | N-0230 Oslo Norway |
| ("O.W.") | | ("Buyer" or 'Counterparty')) |

(Each referred to as a "Party" and together the "Parties")

1.   INTRODUCTION AND INTERPRETATION

1 1   *Scope of Agreement.* O W and Buyer will enter into one or more transactions for physical delivery of bunker oil at a future date with the price fixed in advance (a "Fixed Price Transaction") Unless the Parties expressly agree otherwise each Fixed Price Transaction will be governed by this Master Agreement (this "Fixed Price Master Agreement") and O W's Terms and Conditions of Sale for Marine Bunkers as amended from time to time (the "T&Cs")

1 2   *Trading Procedure* Each Fixed Price Transaction shall be binding on the Parties at the time O W sends a confirmation to Buyer in an e mail substantially in the form set out in Schedule 1 hereto (a "Trade Confirmation") recapping the terms agreed between the Parties of the specific Fixed Price Transaction

1 3   *Inconsistency* In case of any inconsistency between this Fixed Price Master Agreement the T&Cs, any Trade Confirmation and any Order Confirmation (together the "Contract Documents"), the following order of hierarchy shall apply and prevail (1) the Order Confirmation (2) the Trade Confirmation (3) this Fixed Price Master Agreement (4) the T&Cs

1 4   *Single Agreement.* All Fixed Price Transactions are entered into in reliance on the fact that the Contract Documents form a single agreement between the Parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Fixed Price Transactions

2.   NOMINATIONS AND ORDER CONFIRMATIONS

2 1   *Nomination for Delivery* When Buyer wishes to take delivery under a Fixed Price Transaction, Buyer shall by e-mail or instant messaging system deliver a nomination (a "Nomination") to O W that shall specify the Trade Confirmation to which it relates as well as all information necessary for O W to perform the delivery The Nomination must be delivered by Buyer to O W no later than 4 00 PM GMT (CET) on a Business Day

falling at least 5 Business Days prior to the delivery date stipulated in the Nomination. A Nomination is irrevocable once it has been delivered to O W

2 2   *Order Confirmation* O W shall as soon as reasonably practicable following receipt of a Nomination inform Buyer whether or not the Nomination is confirmed and on which terms by delivering an order confirmation (an "**Order Confirmation**") to Buyer

2 3   *Port Flexibility* Where in response to an inquiry from Buyer O W agrees to deliver in a port other than the Base Port (the "Alternative Port") the agreed fixed price for the product in question shall be adjusted with an amount calculated by O W which effects the price difference of the product according to (1) the Platts Bunkerwire index in the Alternative Port and (2) the Platts Bunkerwire index in the Base Port as of a given point in time determined by O W falling in the period between the time the Buyer's inquiry is received by O W and the time the alternative price given by O W provided that if there is no Platts Bunkerwire index available for the relevant product in the Alternative Port the fixed price for the product in question shall be adjusted with an amount calculated by O W which calculation shall be commercially reasonable and reflect among other things the difference between the market price in the Alternative Port and the price according to the Platts Bunkerwire index in the Base Port

2 4   *Product Flexibility* When in response to an inquiry by Buyer O W agrees to deliver a product(the "**Alternative Product**") other than the product designated in the Trade Confirmation (the 'TC Product') the agreed fixed price of the TC Product shall be adjusted with an amount calculated by O W which reflects the price difference of the Alternative Product and the TC Product according to the Platts Bunkerwire index in the relevant port as of a given point in time determined by O W falling in the period between the time the Buyer's inquiry is received by O W and the time the alternative price given by O W provided that if there is no Platts Bunkerwire index available for the Alternative Product the agreed fixed price of the TC Product shall be adjusted with an amount calculated by O W which shall be commercially reasonable and reflect among others the difference between the market price of the Alternative Product and the price of the TC Product according to Platts Bunkerwire index

2 5   *Period Flexibility* Prior to any agreement by O W to extend the Delivery Period agreed in a Trade Confirmation O W shall notify the Buyer of any potential premium or discount calculated by O W which shall in case such extension is agreed be added or deducted by O W to or from the agreed fixed price of the product for the remaining undelivered volume Where O W has agreed to extend the Delivery Period O W shall send Buyer an updated Trade Confirmation reflecting the amended terms

2 6   *Delivery to Nominee* When in response to a Nomination in which Buyer nominates a third party (a "**Nominee**") to take delivery for it O W agrees in the relevant Order Confirmation to deliver to such Nominee Buyer shall notwithstanding such nomination remain liable as principal obligor for its obligations under the Agreement to O W and O W's agreement to deliver to a Nominee shall not in any way be considered a waiver or limitation of the right of O W to exercise its rights towards the Buyer under the Agreement

2 7   *Lack of Volume or Barge Availability* If the Nominated Volume is not available in full in the agreed port (whether Base Port or agreed Alternative Port) or if no barges are

readily available to O W to perform the delivery in such port on the delivery date specified in an Order Confirmation O W shall use reasonable endeavours (which shall for the avoidance of doubt not entail an obligation for O W to incur other than insignificant costs) to fulfil the terms of the Order Confirmation, provided however that in such circumstances any failure to deliver the Nominated Volume shall not constitute a breach of O W s obligations under the Agreement Buyer may in such circumstances seek delivery from alternative sources A Nominated Volume which remains undelivered by O W for the reasons set out in this clause shall be deducted from the Undelivered-Volumes as specified in Clause 3

3. **CASH SETTLEMENT AND FAILURE TO TAKE DELIVERY**

3 1   *Cash Settlement*  Instead of Buyer lifting the agreed volume of a Fixed Price Transaction, O W and Buyer may agree to cash settlement of all or part of such a Fixed Price Transaction, provided that the agreement to cash settle has been made no later than the day falling five (5) Business Days prior to the beginning of the calendar month in which cash settlement is to occur The volume of such Fixed Price Transaction to be cash settled shall for the purpose of calculating the Cash Settlement Amount be considered the "Undelivered Volume" and the relevant Cash Settlement Amount shall be calculated according to Clause 3 2 below and paid on demand

3 2   *Calculation of Cash Settlement Amount*   "Cash Settlement Amount means in respect of a Fixed Price Transaction and an agreed volume (1) the market price as reasonably determined by O W of the Undelivered Volume of the product at the Base Port less (2) the agreed Fixed Price in the relevant Trade Confirmation If the Cash Settlement Amount is a positive number O W shall transfer such amount to Buyer s account and if it is a negative number, Buyer shall transfer such amount to O W s account Payment of a Cash Settlement Amount shall be made no later than two (2) Business Days after notice of payment has been given to the party owing the relevant Cash Settlement Amount

4. **FORCE MAJEURE**

4 1   *Force Majeure Events*  Should performance by a party (the "Force Majeure Affected Party") of its obligations under a Fixed Price Transaction (a "Force Majeure Affected Transaction") become impracticable or impossible for reasons outside of the reasonable control of the Force Majeure Affected Party (such reason a "Force Majeure Event") as determined by the Force Majeure Affected Party acting reasonably and the Force Majeure Affected Party could not after using all reasonable efforts (which will not require such party to incur a loss other than immaterial incidental expenses) overcome such impossibility or impracticability, no Event of Default or other default by the Force Majeure Affected Party shall be deemed to have occurred and the following shall take place with respect to the Force Majeure Affected Transactions (i) the Parties shall work in good faith to determine an alternative place and/or time of delivery or other way of performing under the Force Majeure Affected Transaction and (ii) O W shall on the basis of such agreement calculate any relevant amendments to the terms as set out in the relevant Trade Confirmation and notify Buyer thereof If at any given point in time where such Force Majeure Event is continuing for 15 calendar days or more and the Parties have not been able to reach an agreement either Party may with 3 Business Days' written notice to the other Party terminate the Force Majeure Affected Transactions Following such

termination  neither Party shall have any further liability whatsoever to the other in respect of any such terminated Force Majeure Affected Transactions

5.    CONDITIONS PRECEDENT

5 1   No Event of Default etc  The obligation of each Party to make any payment or delivery under a Fixed Price Transaction is subject to no Event of Default or Potential Event of Default with respect to the other Party having occurred and is continuing in relation any Fixed Price Transaction

6.    EVENTS OF DEFAULT

6 1   The occurrence at any time with respect to a Party of any of the following events shall constitute an event of default (an "**Event of Default**") with respect to such party (the "**Defaulting Party**")  The other shall be referred to as the "**Non-defaulting Party**")

a     *Failure to Take Delivery*  In respect of Buyer only  Buyer fails to  (i) take delivery of any Nominated Volume at the agreed date and time or within 2 days thereof, or to (ii) take delivery of the Total Volume at the last Business Day of the last month of the relevant Fixed Price Transaction where applicable,

b     *Failure to Pay etc.* A Party fails to make, when due, any payment under this Agreement or fails to comply with any other material term of the Agreement and  in either case  such failure is not remedied within one (1) Business Day after notice of such failure is given to the Party

c     *Misrepresentation.* Any representation made  or repeated  by a Party under this Agreement is proven to be false or misleading in any material respect  when made

d     *Breach of Agreement.* A Party fails to comply with or perform any other obligation under this Agreement, if such failure is not remedied within thirty (30) Business Days following receipt of notice of such failure,

e     *Insolvency etc.* A Party is (i) dissolved, (ii) becomes insolvent or is unable to pay its debts as they fall due or admits to be so in writing, (iii) makes a general arrangement with or for the benefits of its creditors, (iv) suspends  making payments  (v) institutes or  has instituted against it a proceeding seeking a judgement of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law other similar law affecting creditor 's rights  or a petition is presented for its winding-up or liquidation and such petition is not withdrawn  dismissed  discharged  stayed or restrained within thirty (30) days  (vi) seeks or becomes subject to the appointment of an administrator  provisional liquidator  conservator  receiver, trustee, custodian or other similar official for it for all or substantially all its assets, (vii) has a secured party take possession of all or substantially all its assets  (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in (i)-(viii)  or (ix) takes any action in furtherance of, or indicating its consent of, approval of  or acquiescence in, any of the acts referred to in this Clause

f   *Cross Default.* The occurrence or existence of an event of default in respect of such Party under any other agreement  between the Parties or in respect of an agreement between a Party and any company affiliated with the other Party  or

g   *Material Adverse Change.* In respect of Buyer only  the creditworthiness of Buyer (or of any entity with which Buyer has merged into) becomes materially weaker than that of Buyer at the time of entering this Agreement

7.   EARLY TERMINATION AND CLOSE-OUT

7 1   *Designation of Early Termination Date.* If at any time an Event of Default has occurred and is continuing  the Non-defaulting Party  may give notice to the Defaulting Party designating a date not later than twenty (20) Business Days following effectiveness of such notice (the "**Early Termination Date**")  By that date some (as determined by the Non-defaulting Party in its discretion) or all Fixed Price Transactions outstanding between the parties shall be terminated

7 2   **Early Termination in Event of Insolvency**  As an exception to Clause 7 1   if the Event of Default that has occurred and is continuing is an Event of Default as described in Clause 6 1 e  then (1) all Fixed Price Transactions as well as (2) all other outstanding transactions or contracts between the Parties that may legally be included in a close-out netting  arrangement (notwithstanding the terms of such other transactions or contracts) shall be terminated on the Early Termination Date specified by the Non-defaulting Party

7 3   *Calculation of Close-out Amount.* The Non-defaulting Party shall as soon as practicable possible after the occurrence of an Early Termination Date determine (in USD) its total losses and costs (or gains) incurred as a result of the termination pursuant to either Clause 7 1 or Clause 7 2  Such calculation may include, but not be limited to  losses and costs (or gains) based upon the replacement value of the terminated transactions as well as all losses and costs (or gains) as a result of maintaining  terminating  obtaining or re establishing any hedge or related trading positions  The Non-defaulting Party shall add any amounts payable by the Defaulting Party and subtract any amounts payable to the Defaulting Party related to the terminated transactions  On the basis thereof the Non defaulting party shall calculate a net amount payable either by the Defaulting Party to the Non-defaulting Party  or vice versa (the  Close-out Amount )

7 4   *Notice of Payment.* As soon as reasonably practicable after the Early Termination Date the Non-defaulting Party shall notify the Defaulting Party of the Close-Out Amount to be received or paid by the Non-defaulting Party  The Close-Out Amount shall be payed by the relevant Party to the other Party within two (2) Business Days of such notice

7 5   *Set-off* If a Close-out Amount or any other amount is payable by the Non defaulting Party to the Defaulting Party  such amount may at the option of the Non-defaulting Party without prior notice be reduced by set off against any other amounts liable  whether matured or contingent or in the same currency  payable to the Non defaulting Party by the Defaulting Party

8.   PAYMENTS AND CREDIT LINE

8.1   *Payments and Gross-up* Any payment to be made by Buyer under this Agreement shall unless explicitly agreed otherwise be made in USD and shall be made without any deduction or withholding for or on account of any taxes of any kind unless such deduction or withholding is required by any applicable law. If Buyer is so required to deduct or withhold then Buyer shall pay to the relevant authorities the full amount required to be deducted or withheld and in addition to the payment to which O.W. is otherwise entitled pay to O.W. such additional amount that is necessary to ensure that the net amount actually received by O.W. (free and clear of any taxes) will equal the full amount that O.W. would have received had no such deduction or withholding been required. If at any date amounts are payable by each Party to the other in the same currency, then such amounts shall be netted

9.   MISCELLANEOUS

9.1   *Notices.* Any notices or other communications in respect of this Agreement may be given to the other Party by e-mail or in writing delivered by registered or certified mail courier or equivalent to the address set out below. Address for notices to O.W. Supply & Trading Stigsborgvej 60, DK-9400 Noerresundby Fax + 45 70 26 52 47. Address for notices to Buyer Western Bulk Chartering AS, Henrik Ibsensgate 100 P.O. Box 2868 Solli, N-0230 Oslo Norway

9.2   *Business Day.* "Business Day" means (a) in relation to payments any day on which banks are open for general commercial business in Copenhagen and in the city where such payment is to be made (b) in relation to deliveries any day on which the relevant port for delivery is open for general business and (c) for purposes of any notice to be delivered a day on which banks are open for general commercial business in the jurisdiction of the Party receiving such notice

9.3   *Capitalised Terms* Capitalised terms used but not defined in this Agreement shall have the meaning assigned to them in the relevant Trade Confirmation or Order Confirmation as applicable

9.4   *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement

9.5   *No Waiver.* Failure by either Party at any time to enforce any terms of the Agreement shall not be considered a waiver by such Party of its rights hereunder or affect the validity thereof

9.6   *No Assignment.* Neither Party may assign or transfer any of its rights and/or obligations under this Agreement to any third party without the prior written consent of the other Party

9.7   *Confidentiality.* The Parties shall keep all matters in relation to this Agreement confidential including, but not limited to the existence of this Agreement. The aforesaid shall however, not prevent the Parties from disclosing information (i) when required by

law (ii) when part of obtaining advice from external advisors subjected to an obligation of confidentiality or (iii) when part of communications between a Party and its affiliates This clause shall continue to apply 2 years after the expiry of this Agreement irrespective of the reason for such expiration

9 8   *Governing Law and Jurisdiction* This Agreement and any non-contractual obligations arising out of or in connection with this Agreement shall be governed and construed in accordance with English law and any disputes arising out of or in connection with this Agreement shall be finally settled as specified in the T&Cs

**IN WITNESS WHEREOF** the Parties hereby enter into this Agreement by their duly authorized officers as of the date written above

For and of behalf of O W

Signature _____          Signature _____
Name                                          Name
Title                                         Title


For and of behalf of Buyer

Signature _____          Signature _____
Name                                          Name
Title                                         Title

SCHEDULE 1
Trade Confirmation   Fixed Price Transactions

This Confirmation constitutes a Trade Confirmation as referred to in the Fixed Price Master Agreement and forms part of the Fixed Price Master Agreement dated as of July 15[t] 2014 as amended and supplemented from time to time (the Fixed Price **Master Agreement**") between **Western Bulk Chartering AS** ("Buyer or  Counterparty") and O W  Supply & Trading A/S ( O W ")

By its signature to this Confirmation  Buyer hereby declares that it has received a copy of O W s T&Cs and has reviewed and agreed to the terms thereof

The purpose of this Confirmation is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below

For O W                                                                  For the Counterparty

| | |
|---|---|
| Product(s) | Product(s) [insert] |
| Total Volume | [insert] m t of Product(s) |
| | The abbreviation  m t  stands for metric tonnes |
| Basis Volume per month | [insert] m t of Products |
| Fixed Price | USD [insert] per m t of Products |
| Delivery Period | from [ ] to and including [ ] |
| Base Port | [ ] |
| Minimum Volume per delivery | [ ] m t |
| Maximum Volume per delivery | [ ] m t |
| Base Port  Nomination  Notice  if differ from Master Agreement | [ ] days |
| Other Port  Nomination Notice  if differ from Master Agreement | [ ] days |
| Payment Term | [ ] days |
| | *The Payment Term is granted only to the extent that the Counterparty's total outstanding debts at any given time are below the credit line applicable to the Counterparty* |
| Other | [ ] |

Signature _____                     Signature _____
Name                                               Name
Title                                              Title

**EXHIBIT 5**

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A**        **GENERAL INTRODUCTION**

A 1        This is a statement of the terms and conditions according to which the
           International O W  Bunker Group (hereinafter called "OWB ) will sell marine bunkers

A 2        These conditions apply to all offers  quotations  orders  agreements  services and all subsequent
           contracts of whatever nature  except where otherwise is expressly agreed in writing by OWB

A 3        General trading conditions of another party will not apply  unless expressly accepted in writing by OWB

A 4        In the case that  for whatever reason, one or more of the (sub)clauses of these general conditions are
           invalid  the other (sub)clauses hereof shall remain valid and be binding upon the parties


**B**        **DEFINITIONS**

B 1        Throughout this document the following definitions shall apply

| | |
|---|---|
| Seller' | means OWB  any office  branch office  affiliate or associate of the OWB Group  being the legal entity within the OWB Group  whose name is included in the Order Confirmation  sent to the Buyer |
| Buyer | means the vessel supplied and jointly and severally her Master  Owners  Managers/Operators  Disponent Owners  Time Charterers  Bareboat Charterers and Charterers or any party requesting offers or quotat ons for or ordering Bunkers and/or Services and any party on whose behalf the said offers  quotations  orders and subsequent agreements or contracts have been made |
| Bunkers | means the commercial grades of bunker oils as generally offered to the Seller s customers for similar use at the time and place of delivery and/or services connected thereto |
| Owner | means the registered Owner  Manager or Bareboat Charterer of the vessel |
| Vessel | means the Buyer s Vessel Ship  Barge or Off-Shore Unit that receives the supply/bunkers  either as end user or as transfer unit to a third party |
| Nomination | means the written request/requirement by the Buyer to the Seller  for the supply of the Bunkers |
| Order Confirmation | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers  In case of conflict between the Nomination and the Order Confirmation  unless the Seller otherwise agrees in writing  the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement |
| Agreement'' | means the concluded terms for the sale/purchase of the Bunkers |
| 'Supplier | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers |
| GTC | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| BDR | means the Bunker Delivery Receipt  being the document(s)  which is/are signed by the Buyer s representative(s) at the place of the supply of the Bunkers to the Vessel  evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel |


**C**        **OFFERS  QUOTATIONS AND PRICES**

C 1        An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
           Confirmation to the Buyer  Each Order Confirmation shall incorporate these GTC by reference so that the
           GTC are considered a part of the Confirmation

C 2        Agreements entered into via brokers  or any other authorised representative on behalf of the Seller  shall
           only bind the Seller upon the Sellers  broker or other authorised representative sending the Order
           Confirmation to the Buyer or the Buyer s broker as the case may be

C 3        The Seller s offer is based on the applicable taxes  duties  costs  charges and price level of components
           for Bunkers existing at the time of the conclusion of the Agreement  Any later or additional tax
           assessment  duty or other charge of whatever nature and however named  or any increase of
           components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
           in the Seller s contemplated source of supply or otherwise  coming into existence after the Agreement
           has been concluded  shall be added to the agreed purchase price  provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances

C 4   All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum

C 5   If the party requesting Bunkers is not the Owner of the Vessel the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner The Seller's decision to forego obtaining a payment guarantee under this Clause C 5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement

C 6   The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery

C 7   If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors

## D.   SPECIFICATIONS (QUALITY – QUANTITY)

D 1   The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever Any and all warranties regarding the satisfactory quality, merchantability fitness for purpose description or otherwise are hereby excluded and disclaimed
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation

D 2   The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum

D 3   Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever

D 4   In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller

D 5   Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered All grades of produce may contain petroleum industry allowed bio-derived components.

## E   MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E 1   The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge tank truck or of the shore tank in case of delivery ex wharf

E 2   The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied Quantities calculated from the Receiving Vessel's soundings shall not be considered

E 3 Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance

E 4 The Buyer expressly undertakes not to make any endorsement  complaint/ comment (including but without limitation any "No-lien" clausing) on the BDR when presented for signature by the Buyer's representative(s)  any such insertion shall be invalid and of no effect whatsoever

E 5 In the event of complaint/comment the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller  setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers  In writing within 7 (seven) days thereof  failing which  any such claim by the Buyer shall be extinguished as non existent  and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred  and the Seller/Supplier s weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered


## F SAMPLING

F 1 The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation  The Buyer's representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles

F 2 In case that dripsampling is not available onboard the barge  tanktruck or shore tank  samples shall be taken as a composite of each tank from which supplies are made  onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top  mid and bottom of the tanks

F 3 The samples shall be securely sealed and provided with labels showing the Vessel s name, identity of delivery facility  product name, delivery date and place and seal number  authenticated with the Vessel's stamp and signed by the Seller s representative and the Master of the Vessel or his representative  The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts  and by signing the BDR both parties agrees to the fact that the samples referred to therein  are deemed valid and taken in accordance with the requirements as specified in this Chapter F

F 4 Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers  or if requested by the Buyer In writing  for as long as the Buyer reasonably required  The other two (2) samples shall be retained by the receiving Vessel  one of which being dedicated as the MARPOL sample

F 5 In the event of a dispute in regard to the quality of the Bunkers delivered  the samples drawn pursuant to this Chapter F  shall be conclusive and final evidence of the quality of the Bunkers delivered  One  and only one  of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests  the result of which is to be made available to both parties  Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested  The parties are to use best endeavours to agree the independent laboratory to perform the tests  If  however  no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested  the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted  and those test result will be final and binding upon Buyer and Seller as set out above

F 6 The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present  or fails to be present at the appropriate time and place  and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking

F 7 No samples subsequently taken shall be allowed as (additional) evidence  If any of the seals have been removed or tampered with by an unauthorised person  such sample(s) shall be deemed to have no value as evidence

F 8 Any eventual samples drawn by Buyer s personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied  The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms, Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels

**G.**     **DELIVERY**

G.1     The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2     The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3     The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs, pilot's, port- or other authorities.

G.4     In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5     The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6     The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7     If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8     The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any other reason.

G.9     The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be on account of the Buyer.

G.10    The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11    In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12    Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank

G 13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions

G 14    The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard

G 15    If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs

G 16    In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If however any of the involved units choose to pursue Seller and/or Supplier Buyer will fully indemnify and hold Seller harmless in relation thereto

G 17    For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe taking weather, swell and forecasts into consideration. Supplier/Seller not to be held responsible for any delays demurrages liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting

G 18    Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded

**H       TITLE**

H 1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non payment

H 2     Until full payment of the full amount due to the Seller has been made and subject to Article G 14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell encumber, pledge alienate or surrender the Bunkers to any third party or other Vessel

H 3     In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention without prejudice to all other rights or remedies available to the Seller

H 4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered

H 5     The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world without prior notice

h 6     Where, notwithstanding these conditions title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller the Buyer shall grant a pledge over such Bunkers to the Seller The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel including any mixtures of the delivered Bunkers and other bunkers Such pledge

will be deemed to have been given for any and all claims of whatever origin and of whatever nature that the Seller may have against the Buyer

H 7     For the avoidance of doubt where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the *Seller for fulfilment of the Agreement*

## I        PAYMENT – MARITIME LIEN

I 1     Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing

I 2     Payment shall be made in full, without any set-off counterclaim deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s)

I 3     (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due or such security as it shall deem to be satisfactory
(ii) In the event that the Buyer shall default in making any payment due the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs) or the Seller may in its discretion elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages including cancellation charges Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies default by any one relevant Buyer in respect to any invoice of The Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates whereupon sub clauses I 3 (i) and I 3 (ii) shall apply as appropriate
(iv) Where the Buyer fails to pay timely the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim The Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer
(v) All judicial costs and extrajudicial costs and expenses including pre action costs fees expenses and disbursements of the Seller's lawyers/attorneys at-law incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions shall be for the Buyer's account immediately payable by the latter to the Seller in case of litigation the Buyers shall also pay all the relevant expenses to the Seller including but without limitation all his reasonable attorneys/lawyers fees costs and disbursements

I 4     *Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller If payment falls due on a non business day the payment shall be made on or before the business day nearest to the due date If the preceding and the succeeding business days are equally near to the due date then payment shall be made on or before the preceding business day*

I 5     Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1 50 per mton supplied or the equivalent thereof in local currency with a minimum administration fee of USD 350 00 for each delivery made All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer

I 6     Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order (1) costs of any kind or nature including but not limited to legal costs and attorneys' fees (2) interest and administrational fee and (3) invoices in their order of age also if not yet due or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant

I 7     All costs borne by the Seller in connection with the collection of overdue payments including those of the Seller's own legal and credit department and including but not limited to reasonable attorneys fees whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer including but not limited to reasonable attorneys fees shall be for the sole account of the Buyer

I 8     The Seller shall at all times in its absolute discretion be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer s obligations under the Agreement Failing the immediate provision of such security upon Seller s demand the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security

I 9    Where Bunkers are supplied to a Vessel  in addition to any other security  the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel  It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof  including but not limited to the reasonable attorney's fees)  such maritime lien afforded to the Seller over the Vessel  In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery  or the flag of the Vessel  or the place of jurisdiction and/or an arrest of the Vessel  or otherwise howsoever

I 10    It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer  All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer  according to these ordinary business terms agreed between them

## J       CLAIMS

J 1    In addition to the obligations referred to in Article E 4 and E 5 herein  any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer  or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest  If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier  such claim shall be deemed to have been waived and shall be absolutely barred for all purposes

J 2    Always without prejudice to Article G 14 herein  any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation  shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation  failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes

J 3    The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions  whether or not it has any claims or complaints  If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied  the Seller or the Seller s nominated representative shall be entitled to board the Vessel and investigate the Vessel s records  log books  engine logs  etc, and to make copies of any such document the Seller or the Seller s nominated representative may consider necessary for its investigations connected to the case  The Buyer shall allow this  or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel s officers and crew in any such manner the Seller or Seller's nominated representative may require  Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel s officers and crew shall constitute a waiver of the Buyer's claim

J 4    The Seller shall be allowed  and the Buyer  Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative  to draw samples from the Vessel's storage tanks  settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory

J 5    In each and  every case  any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers  or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller

## K       LIABILITY – LIMIT TO SELLER'S LIABILITY

K 1    The Seller and/or Supplier shall not be liable for damages of whatever nature  including physical injury  nor for delay of delivery of Bunkers or services  no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller  The Seller shall furthermore not be liable for damages or delay  as described above  when such damages or delay have been caused by the fault or negligence of its personnel  representatives  Supplier or (sub)contractors

K 2    Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time  loss of cargo or charter cancelling date  loss of income or profit/earnings, are excluded  In any event and notwithstanding anything to the contrary herein  liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel

K 3    The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s) The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions Third party shall mean any other (physical or legal) person/company than the Buyer.

K 4    No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller Without prejudice to the above every exemption limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid

## L    EXEMPTIONS AND FORCE MAJEURE

L 1    *Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim damage delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G 3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption delay unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices Neither the Seller nor the Supplier shall be required to make any deliveries which fall in whole or in part as a result of the causes set out in this Article at any later time*

L 2    If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer the Buyer's agent or employees in connection with deliveries hereunder

L 3    Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same However, under no circumstances and for no reason whatsoever can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller

L 3    *In the event that the Seller, as a result of force majeure can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price*

L 4    (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party

    (b)    Without prejudice or limitation to the generality of the foregoing in the event that the third party terms include

    (i)    A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions

    (ii)    Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these

    (iii)    A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party

## M       BREACH/CANCELLATION

M 1      Without prejudice to any other remedies and rights the Seller shall have the option immediately to cancel the Agreement in full or in part or to store or procure the storage of the Bunkers in whole or in part for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate without prejudice to its rights of indemnification without any liability on the side of the Seller in any one of (but not limited to) the following cases

a)              when the Buyer for whatever reason fails to accept the Bunkers in part or in full at the place and time designated for delivery,

b)              when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC

c)              when, before the date of delivery it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller

d)              when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled

M 2      The Seller may terminate any Agreement with the Buyer in whole or in part in its full discretion upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment ceases to carry on business makes an arrangement with its creditors or undergoes any form of bankruptcy administration re organisation or asset rearrangement

M 3      The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller in its sole discretion has reasonable grounds to believe that

a)              The Vessel or

b)              The Charterer of the Vessel or

c)              The fully or partly Owner(s) of the Vessel or

d)              Any officers of the Vessel or

e)              The Operator and/or Manager of the Vessel or

f)              Any other person or entity in any way related to the Agreement or delivery is/are

1)       Iranian(s) or

2)       Related in any way to Iran or Iranians or

3)       Listed on the US OFAC Specially Designated Nationals List or

4)       Covered by any US UN and/or EU sanctions or

5)       Covered by any sanctions of any other jurisdiction and/or administration

Under no circumstances can the Seller be held liable for any loss delays claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply Should the Buyer breach its obligation to inform the Seller the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach including consequential or liquidated damages

M 4      The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law including but not limited to the U S Foreign Corrupt Practices Act ("FCPA") and the UK Bribery Act Therefore the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not and will not offer promise pay or authorize the payment of any money or anything of value or take any action in furtherance of such a payment whether by direct or indirect means to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties making any claims for payment delivery or any other obligation of the Seller under this Agreement void The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence

## N       SPILLAGE, ENVIRONMENTAL PROTECTION

N 1      If a spill occurs while the Bunkers are being delivered the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill  The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action  All expenses, claims, costs, losses, damages  liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission  If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence  The burden of proof to show the Seller's negligence shall be on the Buyer  The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery

## O      DELAYS AND CANCELLATIONS

O 1      Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date

O 2      If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement  where Order Confirmation has been sent by Seller  the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation including  but not limited to  barge costs, re-storing of the Bunkers, and hedging costs  and also in Seller's sole option any difference between the contract price of the undelivered product  and the amount received by the Seller upon resale to another party or  if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes  These losses and liabilities shall be indemnified by a minimum amount  of USD 4,000 by way of agreed minimum liquidated damages  and shall be indemnified in full if they in total exceed USD 4,000

## P      LAW AND JURISDICTION

P 1      This Agreement shall be governed and construed in accordance with English law
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply
Except for circumstance referred to in Clause P 5 below all disputes arising in connection with this Agreement or any agreement relating hereto  save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment)

P 2      In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed  Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the ' LLMA'')  Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration  If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly  The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement  Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator  In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator  either party may apply to the English courts for the appointment of a third arbitrator
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise

P 3      Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator

P 4      In cases where neither the claim nor any counterclaim exceeds the amount of USD 100 000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced

P 5      The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien  regardless of the country in which Seller takes legal action  Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York

P 6     If any procedure of any nature whatsoever is instituted under Clause P 5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding

**Q        VALIDITY**   -

Q 1     These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O W Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date

Q 2     These terms and conditions are available at the website www.owbunker.com on which site as well the Sellers may notify amendments, alterations, changes or verifications to same, Such amendments, alterations  changes or verifications are deemed to be a part of the entire terms once same have been advised on the website

**EXHIBIT 6**

U S OIL TRADING LLC

Thor A Nielsen
Treasurer

November 10, 2014

Western Bulk Carriers AS
Henrik Ibsensgt 100
PO Box 2868 SOLLI
N-0230 Oslo, Norway

RE:     Long Lucky, IMO#9471654

Dear Operator,

We hereby give you notice that that we have delivered bunker fuel to the above listed ship and
have **not** been paid for the product we delivered   Further, U S Oil Trading LLC reserves its rights
in full   The following provides the detail related to the delivered bunker fuel.

|  | Long Lucky |
|---|---|
| Delivery Date | 11/1/2014 |
| Product | RMG-380 |
| Quantity in Metric Tons | 204 19 |
| Total Invoice USD | 107,357 85 |
| Due Date | 12/1/2014 |

If you are **not** the owner of the above named ship, please provide a copy of this notice to the
official ship owner

Regards,

Thor A Nielsen
Treasurer

## U.S. OIL TRADING, LLC

**MARINE BUNKER**
RECEIPT FOR DELIVERY TO VESSEL

| TACOMA REFINERY<br>P O BOX 2256<br>TACOMA  WA 98401 2255<br>(253) 383 1851 | VESSEL NAME<br>**LONG LUCKY** | IMO#<br>**9471654** | VESSEL AGENT<br>**WILHELMSEN** |
|---|---|---|---|
| | BARGE COMPANY<br>**OLYMPIC TUG & BARGE** | BARGE NO<br>**BETSY ARNTZ** | U S OIL S A NUMBER<br>**14-192** |
| | DELIVERY LOCATION (INCLUDE TERMINAL OR DOCK NAME)<br>AT ANCHOR | | |

### PRODUCT

| GRADE | DENSITY<br>kg/m3 @ 15C | API<br>GRAVITY | FLASH<br>PNOC  F | POUR POINT<br>DEGREES  C | SULFUR<br>WT% | BS&W<br>VOL% | VISCOSITY<br>CST @ 50C | VANADIUM<br>PPM | ALUMINUM<br>PPM |
|---|---|---|---|---|---|---|---|---|---|
| RMG 380 | 978 | 13 0 | 193° | -9 | 2 652% | <0 05 | 371 30 | | |
| | | | | | | | | | |
| | | | | | | | | | |

THIS FUEL OIL COMPLIES WITH REGULATION 14 (1) OR (4) (a) AND REGULATION 18 (1) OF THE (POL ANNEX VI

REPRESENTATIVE SAMPLES TAKEN AND RETAINED BY

PHYSICAL PROPERTY TEST RESULTS LISTED BY                    SAMPLES DELIVERED TO BARGE BY

THIS SECTION TO BE COMPLETED BY BARGE COMPANY REPRESENTATIVE

### QUANTITY**

| | GRADE  RMG 380 | GRADE  MGO | GRADE |
|---|---|---|---|
| Total Gross Barrels Delivered By Barge | (1358 62) | 0 00 | 0 00 |
| Temp  and Grav  Conversion Factor | 0 9674 | | |
| Total Net Barrels | -1314 33 | 0 00 | 0 00 |
| Conversion Factor  Bbls/M Ton | 0 15536 | | |
| Metric Tons Delivered | -204 19 | 0 00 | 0 00 |

| DATE AND TIME ALL FAST<br>AT LOADING TERMINAL<br>November 1, 2014       10 22 | TIME STARTED PUMPING<br>TO VESSEL<br>November 1, 2014       11 20 | DATE AND TIME FINISHED<br>PUMPING TO VESSEL<br>November 1, 2014       12 20 |
|---|---|---|

**CERTIFICATION OF EXPORT** Vessel certifies that it intends to use product delivered to barge at U S  Oil s terminal for bunkers on a voyage outside the U S  Port

**EXEMPTION FROM SALES AND USE TAX & AIR POLLUTION REGULATION**  The ship or vessel to which this product is delivered is engaged in operating as a private or common carrier by water in interstate or foreign commerce  The recipient certifies that the product purchased under this receipt 1 for use in connection with its business of operating as a private or common carrier by water in interstate or fore gn commerce if or while the vessel is within the territorial boundaries of the State of Washington  it will not consume the product delivered hereunder  and that the sale is entitled to exemption from the retail sales and use tax of the State of Washington under the provisions of RCW 82 08 0261 and WAC 458 20 175  and exemption from Section 9 07 (d) of PSAPCA Regulation

**DISCLAIMERS**  No disclaimer stamp of any type or form will be accepted on this bunker certificate nor should any such stamp be applied  nor will it alter  change or waive U S  Oil s Maritime Lien against the vessel or waive the vessel s ultimate responsibility and liability for the debt incurred through this transaction

**MARITIME LIENS**  All disputes arising out of this transaction shall be interpreted and enforced in accordance with the general maritime law of the United States of America and all statutes related thereto

**DELIVERY POINT**  Title to and the risk of loss of oil passes to customer on delivery of oil to vessel at the vessels flange

REMARKS

ERRORS MADE BY THE BARGEMAN AND CORRECTED BY THE BARGING COMPANY WILL APPEAR AS CORRECTIONS ON THE WHITE COPY ONLY

PRODUCT DISCHARGED TO VESSEL LISTED ABOVE
A REPRESENTATIVE SAMPLE HAS BEEN DELIVERED TO THE VESSEL REPRESENTATIVE

SEAL #    MARPOL(36832644)SHIP(36832714) BARGE(36832646)

CHIEF ENGINEER OF M.V. LONG

X _____ (BARGE CO  REPRESENTATIVE)    1-Nov-14  (DATE)

X _____ (AUTHORIZED VESSEL)    (TITLE)    1-NOV-2014  (DATE)

# **EXHIBIT 7**



Western Bulk Carriers AS
Henrik Ibsens Gate 100
P O Box 2868 Soli
Oslo
N-0230
Norway

19 June 2015

Dear Sirs

Without prejudice

We are contacting you as a customer of OWB in relation to sums owed by you to OWB in respect of unpaid invoices  These outstanding sums have been assigned to ING Bank N V  (ING) and are now long overdue  As you are aware, Receivers have been appointed by ING (as Security Agent by way of a Security Agreement with OWB) to collect in the amounts owing by customers, including the sums owed by you  The Quality Support Department (QSD) of OWB has been retained to assist the Receivers

You have refused to make payment of the sums due and owing by you to OWB  For the avoidance of doubt, ING's claim to the sums as assignee exists regardless of any claim, if any exists, by the physical supplier  ING's claim and any claim asserted by the physical supplier are not true competing claims, and you should note that in a recent decision in an interpleader action brought by an OWB customer before the Singapore Court the Judge dismissed the customer's interpleader claim (with costs awarded in ING's favour) on the basis that the claims of the supplier and ING arose under different causes of action  The fact that a physical supplier has made or might make a claim against you is therefore no defence to your non-payment of the sums owing to ING

The Receivers are confident that the sums set out in the invoices sent to you are due and owing to ING, together with interest, administration fees and legal costs, in accordance with the agreed OW Bunker Group Terms and Conditions of sale for Marine Bunkers   In this regard, the Receivers have been pursuing and will continue to pursue OWB's customers for full recovery of all sums due, by way of arbitration / litigation (as appropriate) and by way of vessel arrest   The Receivers are proceeding as follows

• First, the Receivers are willing to discuss settlement with OWB customers where monies remain due and owing   As a compromise, ING would be prepared to waive its right to recover contractual interest, administration fees and legal costs if you now confirm that you will make payment in full of the outstanding invoice amount(s)  Such payment should be made into the relevant OWB bank account, as listed on the invoices sent to you, for receipt by ING as assignee

• Secondly  the Receivers acknowledge that for various reasons, which are not accepted, you may not be willing to contemplate a settlement   In these circumstances the debts, including interest, administration fees and legal costs, will be pursued vigorously including if necessary by way of vessel arrest   Having been put to the trouble and expense of taking such action, the terms of any subsequent settlement will be less advantageous to you than the terms alluded to in the above paragraph

• Finally and importantly, if you are not willing to pay the sums due and owing to ING but wish to avoid the disruption that an arrest of your vessel(s) may cause, the Receivers would be willing to accept security for those sums subject to the following conditions

1)  The security is in a form acceptable to the Receivers  We enclose a draft Letter of Undertaking (LOU), which sets out the wording that would be acceptable,

2)  The security is provided by an institution acceptable to the Receivers,

Stigsborgvej 60, DK-9400 Nørresundby, Denmark



3) The security covers the following for each vessel i) all outstanding sums to date (this includes the invoice amount, interest and administration fee), ii) interest for the 6 months following the date of the LOU, iii) an amount to cover reasonable legal fees, and

4)   If, following the lodging of security, the Receivers form the view that the security in place is not sufficient, further security is to be provided  If the parties are unable to agree what additional security should be provided  the dispute as to the adequacy of the security is to be referred to the arbitral tribunal formed to deal with the substantive dispute for a decision as to the amount of additional security to be provided (if any) save that in the event the substantive dispute is being dealt with by a division of the English High Court, Court of Appeal or Supreme Court the decision shall be referred to whichever court has the conduct of the matter and jurisdiction over issues of security for costs and damages at the relevant time

If security is provided but not released unless ING obtains the appropriate arbitration or legal award / order, the Receivers will seek from you payment in full of all the legal costs, administration fees and costs and interest that will be incurred and will be accruing in the time it takes to see this through a formal dispute resolution process

Until such time as the outstanding sums are paid in full or security (in a form acceptable to the Receivers) is put in place, your vessel(s) remain at risk of arrest  By this letter you are considered duly notified of a possible arrest and as such, arrest action(s) will proceed without further notice to you

Please also note that the Receivers are under no obligation to give notice of a possible arrest to any vessel owner in relation to an unpaid invoice  It may be prudent for you to inform the relevant owner of the notifications set out in this letter

If you have not already done so, you may wish to visit the Receivers  website where you will find further information in relation to the Receivers' appointment and the assignment of OWB invoices to ING  The website also has information on the local bankruptcy proceedings of OWB group companies and the co-operation agreements entered into between the Receivers and the trustees of those local bankruptcy proceedings under which the Receivers and the local trustees are working together to collect the unpaid sums owing in respect of OWB invoices  The website address is

http //www pwc co uk/business-recovery/administrations/owbunker

Holly Aplin at holly aplin@uk pwc com or on +44 (0) 2380 835 133 is handling collection of this account

We look forward to hearing from you shortly in response to the above

Regards

Claus Mortensen

Stigsborgvej 60, DK-9400 Nørresundby, Denmark



Dear Sirs

Letter of Undertaking

Ship          [              ] (the "Vessel")

Date          [          ] 2015

Claim         Claim by [O W Bunker Entity] and/or ING Bank N V  against [customer] arising out of the
delivery of bunkers/fuels/lubricating oils on board the Vessel pursuant to contract/order no  [  ] [contract
number should be identified in the invoice as the order number] and invoice no [              ] by [O W  Bunker
entity] in the amount of US$ [   ] (the "Claim")

In consideration of your refraining from taking action resulting in the arrest, detention, or interference in the
use or trading or sale of the above-named ship, or any other ship or asset in the same ownership, associated
ownership, management, possession or control for the purpose of founding jurisdiction and/or obtaining
security in respect of the above Claim, we, [UK based institution approved by ING], hereby agree and
undertake to pay to such account as ING Bank N V  ("ING") may direct within 28 days of ING's first written
demand(s), without set-off, counterclaim or any other deduction whatsoever, and without proof or conditions,
such sum or sums as may be adjudged or declared by any final and unappealable award(s) of a London
arbitration tribunal appointed to hear the Claim, or any final and unappealable judgment(s) of the English
Courts, or as may be agreed in writing between the parties , to be due to either or both of you from
[Customer] in respect of the Claim  interest and/or legal costs, provided always that our total liability
hereunder shall not exceed the sum of US$[          ] (United States dollars [                    ])  For
the avoidance of doubt, our liability under this letter is as a primary obligor and by way of indemnity, not
merely as surety  The enforceability and effectiveness of this letter and our liability under it shall not be
affected  limited  reduced, discharged or terminated by any circumstances whatsoever, and we hereby waive
to the fullest extent permitted by law any defence now or in the future arising by reason of any circumstances
that  notwithstanding the foregoing, would or might otherwise give rise to a legal or equitable discharge or
defence of a surety or guarantor

This undertaking is given without prejudice to any rights or defences which [Customer] may have to the
Claim

This agreement shall be governed by and construed in accordance with English law and any dispute arising
out of or in any way connected with this letter of undertaking shall be subject to the exclusive jurisdiction of
the High Court of Justice in London

Yours faithfully

# EXHIBIT 8

REDACTED

- Forwarded by Holly Aplin/UK/CFR/PwC on 22/07/2015 13 39 ----

From        owbunker-queries
To          sara gillingham@westernbulk com
cc          owbunker-queries@EMEA-UK  qsd@owbunker com <qsd@owbunker com>  Anthony J Thornton/UK/ABAS/PwC@EMEA-UK  Mark X Jones/UK/CFR/PwC@EMEA-UK
Date        22/07/2015 13 34
Subject     URGENT - Receivables due to OW Bunker - (28577      Western Bulk Carriers AS)
Sent by     Holly Aplin


Dear Sirs

We note that we have not yet received a response to our letter dated 19 June 2015 (attached) and that the following invoices remain outs

| Invoice number | Sales order number | OWB Entity | Due Amount (USD) | Invoice date | Due date | Vessel |
|---|---|---|---|---|---|---|
| 188-14873 | 188-14650 | O.W. Bunker & Trading A/S | 205,781.47 | 17/10/2014 | 16/11/2014 | ZHOU SHAN HA |
| 188-14841 | 188-14575 | O.W. Bunker & Trading A/S | 188,205.94 | 13/10/2014 | 12/11/2014 | WESTERN HARM |
| 188-14842 | 188-14574 | O.W. Bunker & Trading A/S | 292,550.01 | 14/10/2014 | 13/11/2014 | VIOLA |
| 188-14960 | 188-14700 | O.W. Bunker & Trading A/S | 294,500.00 | 31/10/2014 | 30/11/2014 | SEA LADY |
| 188-14955 | 188-14652 | O.W. Bunker & Trading A/S | 577,406.96 | 31/10/2014 | 30/11/2014 | OCEAN PROMIS |
| 188-14966 | 188-14726 | O.W. Bunker & Trading A/S | 115,766.23 | 01/11/2014 | 01/12/2014 | LONG LUCKY |
| 188-14937 | 188-14704 | O.W. Bunker & Trading A/S | 336,960.00 | 29/10/2014 | 28/11/2014 | HONY FUTURE |
| 188-14983 | 188-14659 | O.W. Bunker & Trading A/S | 511,500.00 | 21/10/2014 | 20/11/2014 | GREAT SCENERY |
| 188-14922 | 188-14707 | O.W. Bunker & Trading A/S | 514,275.91 | 30/10/2014 | 29/11/2014 | GRACE FUTURE |
| 188-14875 | 188-14651 | O.W. Bunker & Trading A/S | 579,875.58 | 23/10/2014 | 22/11/2014 | FRONTIER HERO |
| 188-14909 | 188-14682 | O.W. Bunker & Trading A/S | 182,718.91 | 20/10/2014 | 19/11/2014 | DENSA LION |
| 188-14967 | 188-14735 | O.W. Bunker & Trading A/S | 537,354.62 | 31/10/2014 | 30/11/2014 | BBG BRIGHT |
| 188-14911 | 188-14681 | O.W. Bunker & Trading A/S | 276,589.50 | 21/10/2014 | 20/11/2014 | AZURE BULKER |
| | | Total Due (USD) | 4,613,485.13 | | | |

I must ask that the USD 4,613,485.13 is paid in accordance with the payment instructions on the face of the invoices (if it is an ING accou **close of business on Friday 24 July 2015.**

Failure to make full payment will result in the application of contractual interest at 3% per month from the due date. We will also be left wit pursue legal actions to recover the balances, **including vessel arrests**

We look forward to hearing from you.

Kind regards

for Paul D Copley

Joint receiver


**Holly Aplin**

PwC
Office: 02380 835 133
Email: holly.aplin@uk.pwc.com
PricewaterhouseCoopers LLP

Savannah House, 3 Ocean Way, Southampton, SO14 3TJ
http://www.pwc.com/

*Paul D Copley, Ian D Green and Anthony V Lomas have been appointed as joint receivers of the Security Assets (as defined in*
*dated 19 December 2013 between O.W. Bunker & Trading A/S and certain of its subsidiaries (as Chargors) and ING Bank N.V.*
*12 November 2014. The joint receivers act as agents and contract without personal liability. Paul D Copley, Ian D Green and A*
*licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wa*

*The joint receivers are Data Controllers of personal data as defined by the Data Protection Act 1998. PricewaterhouseCoopers*
*Processor on their instructions. Personal data will be kept secure and processed only for matters relating to the receivership.*

REDACTED